Filed 11/15/22 In re L.O. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.O., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> W.R. et al., <br><br> Defendants and Appellants. | E079087 <br><br> (Super.Ct.No. J280519) <br><br> OPINION |

APPEAL from the Superior Court of San Bernardino County. Steven A. Mapes, Judge. Reversed with directions.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant W.R.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Appellant K.O.

Tom Bunton, County Counsel, Dawn M. Martin, Deputy County Counsel for Plaintiff and Respondent.

The juvenile court terminated the parental rights of defendants and appellants K.O. (Mother) and W.R. (Father; collectively, Parents) to their son, L.O. (Minor). Father contends the juvenile court erred by not applying the parent-child bond exception to termination (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i)).[1]  Parents contend the juvenile court erred by finding that the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) does not apply because the Department failed to ask Minor's available relatives about Minor's possible Indian ancestry.  We conditionally reverse the judgment with directions.

## FACTUAL AND PROCEDURAL HISTORY

### A.     BACKGROUND

Father was born in January 1998.  Mother was born in August 2003.  Father began dating Mother in 2016, when Mother was 13 years old, and Father was 18 years old.  At that time, Mother was in the care of her mother (Maternal Grandmother).  In June 2017, Father kicked Mother and dragged her by the back of her neck to force her into a vehicle.  A person witnessed the altercation and contacted authorities.  Father was

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

arrested for domestic violence and the statutory rape of Mother. Father was granted probation with the condition that he could only be in the company of minors to whom he is related. Despite the probation condition, Father continued to date Mother. As a result, Father was found to be in violation of his probation. Mother was removed from the care of Maternal Grandmother in September 2017 and became a dependent of the juvenile court.

## B.    DETENTION

Minor was born in late March 2019, when Mother was 15 years old, and Father was 21 years old. Plaintiff and respondent San Bernardino County Children and Family Services (the Department) took custody of Minor in April 2019 because Mother was detained in juvenile hall and no other caretaker could be located. Minor was placed in foster care.

Mother denied having Indian ancestry when speaking with the Department's social worker. On the Department's ICWA form, Mother provided names and telephone numbers for her grandmother (Great-Grandmother) and her stepfather, and Mother again denied having Indian ancestry.

## C.    JURISDICTION AND DISPOSITION

Father was present at the jurisdiction and disposition hearing on April 30, 2019, at which the court referred the matter to mediation. In court, on April 30th, Father denied having Indian ancestry. On the Department's ICWA form, Father denied having Indian ancestry and provided the name, but no contact information, for his mother (Paternal Grandmother). Maternal Grandmother also completed the Department's

3

ICWA form and denied having Indian ancestry. Maternal Grandmother provided names, telephone numbers, and an address for Great-Grandmother, Minor's great-aunt (Great-Aunt), and Minor's grandfather.

The Department spoke with Great-Grandmother, Great-Aunt, Step-Grandfather, and a maternal uncle about whether they would want to care for Minor but did not ask about Indian ancestry. Father resided with his family, but the Department did not ask them about Indian ancestry. At the jurisdiction and disposition hearing, held on October 7, 2019, the juvenile court found ICWA did not apply.

D.    SIX-MONTH TO 24-MONTH STATUS REVIEWS

During the six-month review period, Father had supervised visits with Minor once a week for two hours. During the visits, "[F]ather was observed to be caring, interactive, and affectionate to the child." During the 18-month review period, Father had unsupervised visits with Minor at the Department's office once a week for two hours. Minor was comfortable with Father and there were no issues during the visits. During the 24-month review period, Father had unsupervised visits with Minor twice a week for four hours. Father's visits took place at a park and a friend's apartment. The Department had no concerns regarding Father's interactions with Minor

Minor had been in the same foster home since May 2019, when he was seven weeks old, and was bonded to his foster family. Minor identified his foster parents as his parental figures and they were willing to adopt Minor.

4

E.   30-MONTH REVIEW HEARING

During the 30-month review period, the Department reported the following: Minor "struggle[ed] with tantrums and significant aggression due to not wanting to visit with [Parents].  [Minor] bites, kicks, and hits [Parents] as well as the foster mother when she attempts to take the child out of the car for [F]ather's visits.  For [Mother's] visits, modifications have had to be made in order for [Minor] to transition out of the visit with less aggression as he has shown significant aggression towards [Mother] during visits that [Mother] handles inappropriately.  For [F]ather, the meeting point [with the foster parent] used to be a Starbucks and now when they pass by the Starbucks on non-visit days, [Minor] gets upset because he thinks he is going to a visit."

F.   TERMINATION OF PARENTAL RIGHTS

After the 30-month review period, Father had supervised visits with Minor once a month for two hours at the Department's offices.  In February 2022, the Department social worker wrote, "At times, [Minor] has difficulties transitioning away from the [foster parent] into [Parents'] visitations however, usually does fine once redirected. . . . Since the visitations have been reduced to once per month, [Minor's] aggression during visitations has improved.  Although [Minor] overall appears comfortable with [Parents] during visitations, he is not significantly bonded to either parent.  [Minor] has displayed that he is bonded and identifies with his [foster parents] as his parents."

In late March 2022, the Department social worker reported, "Since the visits were reduced from once per week to once per month, [Minor] has fared significantly[] better.  [Minor's] behaviors have improved and his willingness to visit with [Parents]

5

has improved since the visits were reduced. The reduction of visits has allowed for [Minor] to further bond with his prospective adoptive parents and family. [Minor] appears to be very happy and is doing exceptionally well. [¶] [Parents] have been consistent with their monthly visits and no concerns have been reported. . . . [Minor] does well in the visits and is comfortable with [Parents] . . . however, he identifies with the [foster parents] as his parents and is bonded to them as his parents and not [Parents]. [Minor] is affectionate with [Parents] . . . however, only if prompted . . . . [Minor] does not run to [Parents] . . . upon seeing them, he only runs to the [foster parents] when he sees them following visits. . . . [Minor] does not ask for [Parents] . . . in between visits. In addition, although [Parents] . . . spend small parts of their visits playing with [Minor] and reading him books, most of the visits are spent silently watching movies and not interacting with [Minor]. [Minor] does not display much of an interest in interacting with [Parents] . . . besides watching movies."

On June 1, 2022, the juvenile court held the hearing regarding terminating Parents' parental rights. Father testified that Minor runs to him at visits and tries to leave with Father when the visits end. Father's attorney argued in favor of the parent-child bond exception to terminating parental rights. Father's attorney contended, "There does appear to be a bond between [Minor] and [Father] in that he has constantly expressed himself as being upset at the end of the visits. He looks forward to playing the various games and watching Paw Patrol with [Father]. I think there is a bond there."

Minor's attorney argued, "The visits are fine. That's not the same thing as actually having a bond that would be detrimental to sever at this point." Minor's

6

attorney argued that Minor would suffer detriment if the case persisted because Minor "would always be in a position of somebody trying to take him away from the parents, at this point, he knows."

The juvenile court said, "I'm not going to deny that there is some sort of relationship [Minor] may have with his parents, but it's not to the extent that it would cause great detriment if I were to terminate that relationship. And the benefits of adoption here do outweigh the detriment the child would suffer by severing the parental relationship. I will terminate parental rights."

## DISCUSSION

### A.    PARENT-CHILD BOND EXCEPTION

Father contends the juvenile court erred by not applying the parent-child bond exception (§ 366.26, subd. (c)(1)(B)(i)).

When reunification efforts have failed, there is a statutory preference for adoption. However, in exceptional circumstances, the juvenile court will not terminate parental rights when doing so would be detrimental to the child. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1150; § 366.26, subd. (c)(1).) The parent-child bond exception requires a parent to establish, by a preponderance of the evidence, that the parent regularly visited the child, "that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 629-630); § 366.26, subd. (c)(1)(B)(i).)

When deciding whether to terminate parental rights, the juvenile court is tasked with weighing the potential harm to the child that would be caused by the loss of the

relationship with the biological parent "against the [potential] benefits of placement in a new, adoptive home." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 640.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*)

The evidence reflects that when Minor visited Father on a weekly basis, Minor was aggressive—biting, kicking, and hitting Father. Minor became upset at the sight of the Starbucks where Father picked-up Minor because Minor thought he was going to see Father. Minor's behavior improved when his visits with Father were reduced to once per month. This evidence reflects Minor is less aggressive and under less stress the less he sees Father. Such evidence supports a finding that severing the relationship between Father and Minor would not be detrimental to Minor. Accordingly, the juvenile court did not abuse its discretion in not applying the parent-child bond exception.

B.    ICWA

Parents contend the juvenile court erred by concluding that ICWA does not apply because the Department failed to ask Minor's available relatives about Minor's possible Indian ancestry.

When a child welfare agency takes a child into its custody, the agency has an initial "duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, . . . [and] extended family members . . . whether the

8

child is, or may be, an Indian child." (§ 224.2, subd. (b); see also *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742 (*Benjamin M.*).)

The record reflects that the Department was in contact with and/or had contact information for many of Minor's maternal and paternal relatives. However, the Department only gathered ancestry information from Mother, Father, and Maternal Grandmother. The Department erred by failing to inquire of all the relatives with whom it was in contact and for whom the Department had contact information. The juvenile court erred by finding that ICWA did not apply when the Department's inquiry was incomplete.

The Department contends its ICWA inquiry was adequate because inquiring of every available relative " 'is absurd at best and impossible at worst.' " (*In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1006.) In *Ezequiel G.*, the appellate court explained that there are situations in which it is difficult or nearly impossible to contact extended family members due to incomplete contact information, or situations in which a family is so large that it is not useful to contact all the relatives. (*Ibid.*) Neither scenario is present in this case. The Department was in contact with Minor's extended family to ask about possible placement. Asking the relatives, with whom the Department was already in contact, an additional question about Indian ancestry would not have been absurd or nearly impossible. Thus, the Department's ICWA inquiry was inadequate.

The courts of appeal are divided on how to handle the issue of harmless error in relation to an inadequate ICWA inquiry. Currently, the divided courts have created four different approaches for deciding whether an initial inquiry error is prejudicial. (*In re*

9

*Dezi C.* (2022) 79 Cal.App.5th 769, 777, 779 (*Dezi C.*).) The four different approaches reflect the appellate courts' struggle with how to handle the lack of information in the record. (*Id.* at p. 778.)

We apply the approach known as the readily obtainable information rule because that was the approach set forth by this court in *Benjamin M.*, *supra*, 70 Cal.App.5th at page 744. "If the Department's initial inquiry is deficient, that defect is harmless unless 'the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child' and that 'the probability of obtaining meaningful information is reasonable' ('the readily obtainable information rule')." (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 778.)

The Department had the name, telephone number, and address for Great-Grandmother, and a Department social worker spoke with Great-Grandmother about whether she would be willing to care for Minor. Given that the social worker communicated with Great-Grandmother, information from Great-Grandmother is readily obtainable. The Department social worker spoke with Minor's maternal aunt and uncle about taking custody of Minor, so information is readily obtainable from them. The Department also has names, telephone numbers, and addresses for Great-Aunt and Minor's grandfather, which means information from them is readily obtainable.

Additionally, the Department had an address for Father's home where he resided with his relatives. The Department communicated with the relatives through a San Diego County sheriff's deputy. They communicated about Mother, and Father's

10

relatives provided helpful information to the Department, such as a description of Father's vehicle. Thus, information from those paternal relatives is readily obtainable. When Father moved out of his relatives' home, he moved into a home with his brother. The Department was in contact with Father's brother because the Department gave him Live Scan paperwork. Thus, information from Father's brother is readily obtainable. Further, Father reported to the Department that he took a trip to visit his father in Texas, which means information from Father's father should be readily obtainable. Moreover, Paternal Grandmother participated in visits with Minor and spoke with a Department social worker about taking custody of Minor. Given that the Department was in contact with Paternal Grandmother, information from her is readily obtainable.

If Minor's relatives have knowledge about Minor having or not having Indian ancestry, then that would be meaningful information in an ICWA inquiry. Therefore, it is possible that there is meaningful information which is readily obtainable. As a result, the error is prejudicial, and we will conditionally reverse the order terminating parental rights so a proper ICWA inquiry may be conducted.

**DISPOSITION**

The order terminating parental rights under section 366.26 is conditionally reversed. The juvenile court shall order, pursuant to ICWA and California Rules of Court rules 5.481 and 5.482, that within 30 days of the remittitur being issued that the Department perform a diligent inquiry into Minor's possible Indian ancestry by contacting or attempting to contact the relatives discussed in this opinion and any other relatives for whom it may have contact information. If adequate additional

11

investigation is performed but yields no further information that could assist the Bureau of Indian Affairs or a specific tribe or tribes in determining whether Minor is an Indian child, then the juvenile court shall reinstate its section 366.26 order. If, as a result of that inquiry, new information is obtained that may assist the Bureau of Indian Affairs or a tribe in determining whether Minor is an Indian child, then the juvenile court shall order the Department to provide the relevant tribe(s) and the Bureau of Indian Affairs with proper notice of the pending proceedings.

In the event no tribe responds indicating Minor is an Indian child, or if no tribe seeks to intervene, then the juvenile court shall reinstate its section 366.26 orders. If a tribe determines that Minor is an Indian child and seeks to intervene in the proceedings, then the juvenile court shall vacate its prior orders and conduct all proceedings in accordance with ICWA and related California laws. (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 409.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

SLOUGH
J.

RAPHAEL
J.

12